EMILY WOODS v. MINNIE WILSON and WALTINE WILSON, Defendants, THE FIRST NATIONAL BANK OF NEOSHO and PAUL LILES, Sheriff, Defendants and Appellants.—108 S. W. (2d) 12.

Division One, July 30, 1937.

*Leo H. Johnson* for appellants.

*Ruark & Ruark* for respondent.

BRADLEY, C.—The purpose of this suit was to correct a description in a deed and to determine title. The court found that plaintiff was the fee simple owner of the land in question and decreed the correction of the description. Two of the defendants, First National Bank of Neosho and Sheriff Paul Liles appealed.

Plaintiff alleged that she acquired title by purchase from defendants, Minnie Wilson and Waltine Wilson, husband of Minnie, to the south half of the NE¼ of the NE¼, Section 11, Township 24, Range 33, Newton County, Missouri; that on August 23, 1932, the Wilsons executed and delivered to her a quitclaim deed for the purpose of conveying said land to her; that by this deed the grantors intended to convey the above-described land; but that by mutual mistake of all the parties, including the scrivener, the land was described in the deed as the east half of the NE¼ of the NE¼ of said section. It is further alleged that defendant, First National Bank (hereinafter called the bank) claimed the land by virtue of an execution sale under a judgment of March 3, 1927, in favor of the bank and against the grantors in the deed. Plaintiff asked reformation as to description and also asked that the title be determined.

Defendants, Minnie and Waltine Wilson, filed answer admitting the error in description, and asked reformation. The bank in a separate answer denied generally, except as to its corporate status. Further answering, the bank alleged that it was the owner in fee of the south half of said NE¼ of the NE¼ under sheriff's deed dated December 3, 1934 (petition in present case was filed on that date); that the sheriff's deed was the result of an execution sale under a judgment bearing date of March 3, 1927, in favor of the bank and against the grantors in the quitclaim deed to plaintiff; that George Woods, father of Minnie Wilson, owned the land in question on the date of the judgment, and that Minnie had no interest in the land until July 7, 1932 (date of the father's death), and that upon the death of the father, the land became Minnie's under her father's will, subject to the life estate of the widow, who died June 10, 1934.

The bank further alleged that on August 6, 1932, and subsequent to the death of George Woods, execution was issued on its judgment against Minnie Wilson and her husband and that the land in question was levied upon and notice of levy filed in the office of the recorder of deeds; that at the October Term, 1932, of the circuit court the execution defendants, Minnie and Waltine Wilson, ap-

peared and filed a motion to quash the execution, and that as a result of this motion the sale under the execution was "called off" and the motion to quash was continued by agreement to the next regular term; that thereafter, said motion was continued from term to term until the October Term, 1934, at which time (October 12, 1934) the motion was overruled and an *alias* execution was issued; that under the *alias* and on same day of its issue, Sheriff Liles levied upon the land in question and filed notice of levy with the recorder.

Defendant bank further alleged that the quitclaim deed from defendants, Minnie Wilson and her husband, to plaintiff, was antedated "in an effort to convey" land in question *prior* to the filing of a petition by the bank "to renew" its judgment against the grantors in the deed. (The petition to revive was filed September 7, 1932; *scire facias* was issued same day, and judgment revived October 10, 1932.) And the bank alleged that the deed was voluntary and for the purpose of defrauding creditors, and especially defendant bank. The bank asked that the quitclaim deed be canceled, and that title to the land in question be determined. Defendant Liles, the sheriff, in a separate answer adopted as his answer, the allegations in the answer of the bank.

There is no dispute about what occurred and when. The bank alleged that the quitclaim deed was antedated, but there was no evidence to support this charge. Plaintiff contends that the lien of the bank's judgment expired on the lapse of three years after its rendition (Sec. 1105, R. S. 1929, Mo. Stat. Ann., sec. 1105, p. 1400), and that since her grantor, Minnie, did not acquire title to the land until after the lapse of three years from the rendition of the judgment, that she (plaintiff) took title under the quitclaim deed free from any lien of the judgment against her grantors. On the other hand, it is contended by the bank (1) that there was no consideration to support plaintiff's deed of August 23, 1932, and that said deed was voluntary and void as to creditors; (2) that under the facts, even though the consideration were sufficient, still plaintiff's deed was subject to the bank's judgment, independent of the executions, the first of which was issued and levy made seventeen days prior to plaintiff's deed; and (3) that the executions were so related that the lien created by them is superior and prior to plaintiff's deed.

No point is made on the action of the trial court in decreeing correction of the description in the deed from the Wilsons to plaintiff, hence it is not necessary to consider that subject.

■ Was plaintiff's deed voluntary and void as to creditors? George Wood, the father, was surety on a note for his daughter, Minnie, and her husband, to defendant bank, and had to pay this note. To do so, he obtained $100 from plaintiff, and on July

12, 1926, he gave his check to the bank for $472.93 to pay this note. Later, this matter was adjusted among the family parties by Minnie and her husband executing a note for $487, payable to plaintiff. This note was dated September 1, 1930, due in six months, with interest at eight per cent from date. It seems that Emily had remained at home and that the father, when the note was executed, intended for it to be the property of plaintiff. However, it was not then delivered to her, and she did not have actual possession of the note until she obtained it from the father's safety deposit box after his death. Plaintiff and her brother Robert were the executors of the father's will, and the $487 note was not included in the inventory of the estate, but plaintiff on cross-examination, stated that this note was "a part of his estate at his death." The father made his will March 30, 1931, devising to his wife a life estate in his real and personal property, and to his five children he devised certain land, subject to the life estate of the mother, and the land devised to Minnie Wilson is the land here in dispute. To plaintiff he devised certain land, not involved here, and the residue of his estate. After the will was probated, Minnie Wilson and her husband executed the deed in question, conveying to plaintiff the land in question, which then was still subject to the life estate of the widow. The $487 note was the consideration for the land, and there is no claim that the consideration was not adequate. Plaintiff was not present at the time the deed by the Wilsons to her was executed, and did not know that it was being then executed, but she testified that she knew the "deed would be executed before it was done;" that she got the deed "about a week after it was made," and that "we talked it over" before the deed was made. It is suggested by the bank that the deed was executed to *secure* the note and not to pay it. Plaintiff, as to this, testified: "Q. Well, what was the arrangement, if there was any, as to why the deed was made? Tell the court about it. A. Well, I had the note and they had the land and they gave me the note for the land, to hold the note for security. Q. You mean they gave you the deed? A. The deed, yes. Q. In other words, they made the deed to you to hold the security on your note? A. Yes, sir." And it appears from Minnie Wilson's evidence that she had some notion that the deed was to secure the $487 note. The note was turned over to the Wilsons, which was entirely inconsistent with the notion that the deed was given as security for this note. It is apparent that plaintiff was confused when on the stand, and did not fully appreciate the import of some questions asked her. But we do not regard the subject of security as important. That is a matter between the two sisters, plaintiff and Minnie.

We think that the evidence is clear that the $487 note was the property of plaintiff, so far as concerns the present cause, and that

she was a bona fide creditor of the Wilsons. Such being so, the Wilsons had the right to prefer her, if they so desired. [Farmers & Merchants Bank of Festus v. Funk, 338 Mo. 508, 92 S. W. (2d) 587.]

Was plaintiff's deed subject to the bank's judgment, independent of the executions? This contention is made by the bank on the theory that the lien of its judgment attached to the land in question upon the death of George Wood, and ran three years from that time. For convenience, we indulge here in a bit of repetition. The bank's judgment against the Wilsons was rendered March 3, 1927. George Wood, who owned the land, died July 7, 1932, on which date the land passed under his will to Minnie Wilson, subject to the life estate of the widow. August 23, 1932, the Wilsons conveyed the land to plaintiff. Thus, it appears that five years, four months and four days lapsed after the rendition of the bank's judgment before Minnie Wilson *acquired* title to the land. Section 1105, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1105, p. 1400) provides: ''The lien of a judgment or decree shall extend as well to the real estate acquired after the rendition thereof, as to that which was owned when the judgment or decree was rendered. Such liens shall commence on the day of the rendition of the judgment, and shall continue for three years, subject to be revived as hereinafter provided; but when two or more judgments or decrees are rendered at the same term, as between the parties entitled to such judgments or decrees, the lien shall commence on the last day of the term at which they are rendered.''

There is nothing in the statute to support the contention that the lien of a judgment, absent revival, attaches to real estate *acquired* by the judgment debtor more than three years *after* the rendition of the judgment. The statute says that *''such* liens shall *commence* on the *day* of the rendition of the judgment.'' (Italics ours.) What liens shall commence on the day of the rendition of the judgment? Clearly, we think, liens on the real estate owned (in the county of the judgment) by the judgment debtor at the time of rendition of judgment, and liens on real estate (in the county) acquired within three years after the rendition of the judgment.

The bank relies upon Smith v. Thompson, 169 Mo. 553, 69 S. W. 1040, to support the contention here being considered. That case was a suit to enjoin a sale under a deed of trust. In 1895, the Circuit Court of Grundy County rendered a judgment in favor of the City of Trenton and against one F. M. DeVorss for $100. Under an execution based on this judgment all the interest of the judgment debtor in the land was sold to the plaintiff Smith November 19, 1897, and he received sheriff's deed and took possession. Prior to the execution sale DeVorss filed motion to quash the execution on the

ground that the land about to be sold under the execution was his homestead. This motion was overruled. After the sale he filed motion to set aside the sale on same ground as in the motion to quash. The motion to set aside was also overruled. March 25, 1897, and prior to the execution sale, DeVorss and his wife executed a deed of trust on the land to the defendant Thompson, curator for Charles DeVorss, a minor, and it was a sale under this deed of trust that was sought to be enjoined. Answering the petition to enjoin sale under this deed of trust, Thompson pleaded the homestead claim of F. M. DeVorss. The trial court found and held that DeVorss *abandoned* the land as a homestead in February, 1897, and that upon such abandonment the *lien* of the judgment against him *then* attached to the land. This court in ruling the Smith-Thompson case said (169 Mo. 1. c. 561, 69 S. W. 1040): ''The statute (now Sec. 1105) declares that the lien shall commence from the date of the judgment and continue three years, but that is intended to fix the period of duration or life of the lien. It does not mean that if there is no property owned by the judgment debtor at the date of the rendition of the judgment against which the lien can attach there shall be no lien, for in the same section it is said: 'The lien of a judgment or decree shall extend as well to the real estate acquired after the rendition thereof as to that which was owned when the judgment or decree was rendered.' ''

But it will be noted that the homestead in the Smith case was abandoned in less than three years after the rendition of the judgment against DeVorss, the homestead claimant, and we find nothing in the case to support the contention that the lien of a judgment on after acquired real estate runs three years from the time of acquiring.

In 34 Corpus Juris, page 590, section 902, it is said: ''In a few jurisdictions, a judgment is not a lien on after-acquired real property, although an independent execution lien may be acquired thereon. But under the statutes of most jurisdictions, the lien of a judgment attaches, not only to real estate owned by the debtor at the time of the rendition of the judgment, but also to all that he may subsequently acquire, so long as the judgment remains active and unsatisfied.'' Smith v. Thompson, supra, is cited by Corpus Juris immediately following the language; ''so long as the judgment remains active and unsatisfied.'' We think a better expression would be, ''so long as the lien of the judgment remains alive and effective.'' The trouble with the bank's situation in the present case, is that the *lien* of the judgment against the Wilsons had ceased to be alive and effective when Minnie Wilson acquired the land in question.

Hill v. Arnold (Mo.), 177 S. W. 343, is somewhat pertinent here. Headnote 1 in the Southwestern reflects the substance of the ruling

there made, which headnote is as follows: "Where a decree had been rendered canceling a deed of trust, but giving the beneficiary thereunder a lien on the land for an amount found to be due him, the mortgage lien was extinguished and the only lien which could be claimed was that of the judgment, which became dormant after three years under Revised Statutes 1909, section 2125 (now Sec. 1105), so that a purchaser from the owner acquired a good title as against a subsequent sale on a special execution issued on the decree seven years after it was rendered." [See, also, Crittenden v. Leitensdorfer, 35 Mo. 239, l. c. 243; King v. Hays et al. (Mo. App.), 9 S. W. (2d) 538, l. c. 540; Christy v. Flanagan, 87 Mo. 670.] The bank does not cite us to any case and we find none which holds that, absent revival, the lien of a judgment attaches to real estate acquired by the judgment debtor more than three years after the rendition of the judgment, nor do we find any authority for the proposition that the lien of a judgment on after acquired real estate, acquired within three years after rendition of judgment, will run for three years after attaching. We rule, as the statute (Sec. 1105) clearly means, that the lien of a judgment, absent revival, runs *only* from its date, both as to present owned and after acquired real estate of the judgment debtor, and that the lien expires on the lapse of three years from the date of the judgment, unless the judgment is revived.

Did the bank have a lien superior to plaintiff's deed, because of the executions and levies thereunder? As stated, the first execution and levy was made August 6, 1932, which was seventeen days prior to plaintiff's deed. At the time this execution was issued and the levy thereunder, the land belonged to Minnie Wilson, one of the judgment debtors. Section 1208, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1208, p. 1448) reads: "In all cases where an execution is or shall be issued and levied by the proper officer upon real estate, and for any cause a sale of such real estate shall not be made at the next term of the court of the county in which such sale is to be made, the execution and lien created thereby shall remain and continue in force until the end of the second term of the court of the county where the land is situated, and until a term of said court is held, at which said real estate may be sold according to law."

Sale was not had under the execution. Motion to quash was filed, and the sale was called off, but the motion was continued from term to term until the October Term, 1934, and was finally overruled October 12, 1934. Under Section 1208, the lien of the first execution expired long prior to October 12, 1934, when the motion to quash was overruled. The statute says that the lien of this execution remained "in force until the end of the second term of the court . . . and until a term" of the court was held. There is no claim

488

that the second term of the court, after this execution was issued, had not been held and ended before the motion to quash was overruled. This being the case, the first execution was *dead* when the motion was overruled, and overruling the motion did not restore life to the execution. All this would be beside the point, except for the contention, in effect, that this first execution kept matters alive and gave the same priority, over plaintiff's deed, to the second execution that the first one had on the date of its issue. At the end of the second term of the court after the issue of the first execution, the situation was the same as if the first execution had not been issued, because at that time the first execution expired, and the lien created by it then ceased to exist. There can be no other reasonable construction of Section 1208.

We now take up the second execution, the *alias*. It was issued October 12, 1934, more than two years after plaintiff obtained her deed. The land was sold December 3, 1934, under this second execution and the bank was the purchaser at the sale and received the sheriff's deed. In view of our ruling as to the first execution, there is nothing to rule respecting the second and the sale thereunder.

It is our conclusion that the judgment should be affirmed, and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.